**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:23-cv-81287-LEIBOWITZ/MATTHEWMAN**

**ALEX FREEMAN,**
     *Plaintiff,*

*v.*

**JUPITER INLET COLONY,**
     *Defendant.*
_____/

## <u>ORDER DENYING SUMMARY JUDGMENT</u>

In civil litigation in federal court, when litigants seek damages for asserted legal violations, factual questions of importance are answered by a mix of citizens who come together to decide if the evidence adds up to a legal violation (or doesn't add up). No matter how large or consequential, juries decide facts that touch upon the very character of a community and the officials who govern in their name. Unless the evidence in the record (or the lack thereof) is so clear and one-sided such that no reasonable jury could find otherwise, ultimate issues of fact are for juries to decide.

Did a town in South Florida racially discriminate against one of its police officers and violate federal law when it did not select him as its new Chief of Police and demoted him? To this point, the overt racial discrimination in this summary judgment record (by police officers and elected officials) echoes a shameful era of Florida's history chronicled by authors like Gilbert King.[1] That said, the only question today is whether the law requires judgment for Defendant Jupiter Inlet Colony before a jury ever hears anything. The summary judgment record in this case is unusual; it contains facts that allow the Plaintiff to overcome a particular hurdle that often proves insurmountable in cases alleging that municipalities be held liable for civil rights violations. On this record, the evidence is not so one-

---

[1]     Gilbert King, *Devil in the Grove: Thurgood Marshall, the Groveland Boys, and the Dawn of a New America* (Harper Perennial 2012).

1

sided that a jury could not find the municipality itself to be liable.  As explained more fully below, trial evidence may be put before a jury so it may decide if Jupiter Inlet Colony was itself complicit and let itself be used as a tool by a subset of its Commissioners to perpetrate an unlawful, discriminatory act.

Before the Court is a Motion for Summary Judgment by Jupiter Inlet Colony ("JIC") [ECF No. 45] (the "Motion"), filed on September 13, 2024.  Plaintiff has responded in opposition [ECF No. 55], and Defendant has replied [ECF No. 61].  The Court held a hearing on the Motion on December 13, 2024, at which counsel for both parties appeared and presented argument.  [*See PAPERLESS MINUTE ENTRY*, ECF No. 67].  The parties further supplemented the record with their views on the application of additional case law applied to the case at bar.  [ECF Nos. 69, 70, 75].  The Court has carefully reviewed all the briefs, the entire record, and the applicable law.  After consideration, Defendant's Motion for Summary Judgment is DENIED for the reasons explained below.  Under federal law, a mix of citizens will decide the ultimate factual issues here; there is no legal impediment that forecloses the Plaintiff from presenting these facts to a jury at trial.

## I.    BACKGROUND

Before we get started with the factual background, it is important to bear in mind:  these are not the only facts.  A trial will adduce these facts and others—both for and against both parties' positions—and a jury will decide what witnesses to credit (or discredit), what all the evidence shows (or doesn't show), and therefore what ultimate facts have been proved (or have not been proved).  On a motion for summary judgment, however, the moving party (JIC here) has the burden of proving the absence of a genuine issue of material fact, and all reasonable factual inferences are drawn in favor of the non-moving party (here, Freeman).  *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  With that in mind, here's the summary of the evidentiary record so far.

This employment discrimination case arises from JIC's decision to deny Plaintiff, Alex Freeman ("Freeman"), the position of Chief of Police.  Freeman alleges he was denied the position

because of his race and asserts three race discrimination claims against JIC:  Count I (42 U.S.C. § 1981—Discrimination); Count II (42 U.S.C. § 1983—Equal Protection Clause Discrimination); and Count III (Title VII, Civil Rights Act of 1964, Race Discrimination).  [SAC, ECF No. 24].

Freeman has spent his entire 20-year career in law enforcement.  [PSOMF, ECF No. 54 ¶ 52]. He started as a police officer in Riviera Beach in 1993, where he rose to Major of Police, which position he held until 2015.  [*Id.*].  From May 2021 to May 2022, Freeman served as Chief of Police for the City of Midway.  [PSOMF ¶ 52].

In October 2022, JIC's Chief of Police ("Chief Pruitt") hired Freeman as a part-time police officer.  [Deposition of Dan Comerford ("Comerford Depo."), ECF No. 43-2 at 11:14–19].  Freeman was the first black police officer in JIC history.  [Comerford Depo. at 18:9–12; Deposition of Kevin Lucas ("Lucas Depo."), ECF No. 53-4 at 32:18–22].  JIC's only other black employee was Town Administrator Kevin Lucas ("Lucas" or "Kevin").  [*See* Comerford Depo. at 36:18–19; Lucas Depo. at 10:6].  Shortly before Freeman's start date, Lucas telephoned Freeman, asking if he would be interested in becoming JIC's next Chief of Police.  [Comerford Depo. at 13:25–14:2].  Chief Pruitt intended to retire in 2023, so JIC needed to find a replacement.  [*Id.* at 15:15–21].  After some discussion, Freeman agreed to serve as JIC's Police Chief after Chief Pruitt retired.  [*Id.* at 17:5–9].

On or about April 3, 2023, JIC's Mayor, Dan Comerford ("Mayor Dan"), appointed Freeman Deputy Chief of Police, a full-time position, in anticipation of Freeman's ascent to Chief of Police upon Chief Pruitt's retirement.  [*Id.* at 19:11–14, 25, 20:24–25, 21:1–3; *see* Lucas Depo. at 7:1–12].  At that time, Mayor Dan "served as both a Strong Mayor and the Police Commissioner…[with] sole authority per the town to promote, terminate, and suspend employees."  [Comerford Depo. at 24:10–14].

When word got out that Freeman was to become Chief of Police, "all hell broke loose." [PSOMF ¶ 65; Lucas Depo. at 7:15].  "Mayor Dan received approximately 107 emails from residents,"

3

complaining about the decision.  [Comerford Depo. at 35:25–39:19].  Mayor Dan testified that some JIC residents opposed Freeman's selection on the grounds that "he's a bad person for no other reason than he's a different color from the rest of us."  [*Id.* at 36:16–18].  One resident e-mailed Mayor Dan that Freeman's serving as Chief is "scarry [sic] at best" and a "cancerous problem," saying "we have a real crisis in town hall," and expressing his view that he did not want the town to be run by Mayor Dan, Freeman, and Lucas (who is also black).  [ECF No. 53-6 at 1].  This same resident complained that since Lucas and Freeman's hiring, the "town has been going down."  [Lucas Depo. at 9:23].

The next Commission meeting, held on April 10, 2023, "was a packed event, so much so that attendees filled the meeting hall and ante room."  [PSOMF ¶ 70].  According to Mayor Dan, there were 60–70 people in the room and 30 on the Zoom video conference line.  [Comerford Depo. at 32:10–11].  Meeting attendees were "screaming, yelling, cursing at the commission."  [*Id.* at 32:12–13; Lucas Depo. at 8:13].  At the meeting, JIC Commissioner Dick Busto ("Busto") moved to have Freeman *not* serve as Police Chief, and JIC Commissioner Vice-Mayor Chip Block ("Block") seconded the motion.  [*See* Comerford Depo. at 30:9, 15–17, 26:21–27:2].  Mayor Dan testified that Commissioners Busto and Block did not want Freeman to serve as Police Chief "because he's black." [*Id.* at 28:1-14, 31:1].  Mayor Dan also testified that Freeman was "physically accosted by a resident, who is a racist," at the April 10 Commission meeting.  [*Id.* at 32:14–15].

At the conclusion of the April 10 meeting, the Commission voted in favor of the motion *not* to have Freeman serve as Police Chief and instead appointed Bob Shultz ("Shultz"), a white male,[2] to serve as Acting Chief.[3]  [*Id.* at 30:21–25, 31:8–9, 38:1-22].  According to Mayor Dan, the Commission's

---

[2]      *See* Jupiter Inlet Colony, Investigation of the Complaints of Alex D. (Alex) Freeman (Sept. 7, 2023) ("Investigative Report") [ECF No. 53-10 at 1].

[3]      Mayor Dan testified that Schultz was elevated three ranks from Lieutenant to police chief (skipping captain and deputy chief) "so that everybody is happy in town."  [Comerford Depo. at 30:21–25].

decision not to have Freeman serve as Police Chief "was racially motivated." [*Id.* at 91:7–20]. "[T]o calm things down" in the heat of the moment, Mayor Dan decided to appoint a committee (something never done before)[4] to vet police chief candidates. [*Id.* at 39:15–17].

Mayor Dan's plan was to have the vetting committee comprised mostly of police chiefs, but that did not happen. [*Id.* at 39:22–40:4]. The "entire process" Mayor Dan laid out for the selection process "was changed … dramatically." [*Id.* at 41:5–25]. The selection process was hijacked by Commissioners Block and Busto (who had vetoed Freeman's hiring), who appointed themselves co-chairs of the Selection Committee. [*Id.* at 40:13–41:5]. Block and Busto hired an outside consultant to advertise the position and screen potential candidates. [*See* Deposition of Sheri Resnick ("Resnick Depo."), ECF No. 53-2, at 5:10–11]. The consultant posted the job and fielded 131 applications within two weeks. [*Id.* at 6:9–18].

The outside consultant screened all applicants and put them into "three piles: not qualified, sort of qualified, and highly likely strong candidates." [Comerford Depo. at 41:5–7]. On June 5, 2023, the consultant provided the Selection Committee with a list of top applicants, and that list included Freeman. [*See* ECF No. 53-9]. However, shortly before Freeman was slated for discussion, now-Mayor Block sent an e-mail to the consultant on June 23 which Freeman asserts showed Block's intention to prevent Freeman from ever becoming Police Chief. [PSOMF ¶¶ 83, 84 (citing ECF No. 53-5); *see* Comerford Depo. at 42:3–25].[5]

There is more in the summary judgment record that throws light upon the selection process and allows for inferences of irregularity and discrimination (when, as this Court must at this stage, all reasonable factual inferences in the record are drawn in favor of Freeman). "The top pile [of

---

[4]     [Comerford Depo. at 13:13–21].

[5]     While the June 23 e-mail may permit inferences that may be favorable to Plaintiff, it is for a jury to decide after weighing all the evidence whether it admits the claimed intention.

applicants] was manipulated … to add people to that pile by members of the [selection] committee." [Comerford Depo. at 41:5–7]. When Mayor Block "learned that [Dan] Kerr was not on the list, . . . he directed the [committee] to place [Kerr] on the list." [Comerford Depo. at 42:19–43:1]. Even though Kerr had originally applied for the position, he did not make the consultant's list of top candidates. [Resnick Depo. at 21:1–12; Comerford Depo. at 42:3–25]. The outside consultant subsequently interviewed the top candidates *via* Zoom. [Comerford Depo. at 41:9–10]. However, "there was supposed to be input by the community [but]… there was no input from the community. There were no workshops to have [input]… from the community." [*Id.* at 41:10–11].

At the end of the process, the Selection Committee was supposed to "present two or three final candidates to the commission and the commission was going to interview two or three people and pick a final candidate to be the chief. None of that happened." [*Id.* at 41:13–18]. Instead, "the consultant recommended a single candidate, Dan Kerr." [*Id.* at 79:23–24]. Kerr is a white male. [*Id.* at 42:1, 43:15–21].

On August 2, 2023, the Selection Committee brought Kerr "forward to the commission for acceptance and approval." [*Id.* at 79:24–80:1; *see* Declaration of Milton Block ("Block Decl."), ECF No. 43-3 ¶ 27]. And the "vote to approve Mr. Kerr was … unanimous." [Comerford Depo. at 80:5–7; ECF Nos. 43-3 ¶ 22; 43-8 ¶ 13; 43-9 ¶ 8; 43-10 ¶ 8; 43-11 ¶ 12]. So, even though the outside consultant rated Freeman a "strong candidate," and while Kerr was not on the consultant's strong candidate list at all, Freeman never made it to the Commission for consideration, and Kerr (a white male) became police chief after the consultant recommended one candidate. [Comerford Depo. at 42:1, 43:15–21].

Meanwhile, while this vetting was underway (sometime in June 2023), Mayor Block directed Acting-Chief Schultz to make Freeman's life "miserable" so he would quit. [*Id.* at 28:12–29:9, 82:24–85:9]. On August 7, 2023, Freeman complained about Schultz's discriminatory treatment of him, and

JIC hired an outside investigator to investigate. [*See id.* at 21:12–25]. After Freeman made his complaint, Mayor Block instructed Lucas "three different times" to "bring [Freeman] down to part-time… and change his salary to that," but Lucas "refused," saying "you cannot touch [Freeman's] salary or position" because that would be "retaliation." [Lucas Depo. at 19:24–20:6]. Not taking "no" for an answer, Mayor Block "went ahead and put [Freeman] down to part-time and changed [his pay] from a salary down to… $27.00 an hour. And only gave him 16 hours a pay period." [*Id.* at 22:17–21].

The investigation into Freeman's complaints about discriminatory treatment by Schultz took place between August 10 and September 2, 2023. [Investigative Report at 1]. That investigation revealed that, as early as June 22, 2023, Schultz was actively trying to cause Freeman to quit by (1) calling departmental meetings that excluded Freeman (who remained Deputy Police Chief at that time); (2) attempting to have Freeman's computer access removed; (3) having Freeman's name removed from his assigned mailbox; and (4) generating and distributing a departmental roster that omitted Freeman. [Investigative Report at 2–5; *see* Comerford Depo at 28:16–25]. In addition, Schultz made the following derogatory comments about Freeman in front of JIC employees and officials: (1) referring to Freeman as a "nigger" as he sat in his office; (2) stating he did not want a "jigaboo mentality in the office," and that JIC was wasting its money on Freeman's salary; (3) "This is what happens when you put a nigger in a spot like that"; (4) "I don't know why anyone would want to live in a NIG infested area" (referring to Atlanta); (5) when asked if Freeman was coming to lunch, replying "who knows what that nig is doing." [Investigative Report, ECF No. 53-10 at 5–6].

The investigative conclusion was that Schultz treated Freeman "differently" and "based on the continued use of racially offensive language, it is possible that Shultz's actions were racially

motivated." [*Id.* at 7]. As a result, JIC terminated Schultz's employment. [Deposition of Alex Freeman ("Freeman Depo."), [ECF No. 43-1] at 79:19–23; Lucas Depo. at 29:3–10].[6]

The record also reflects that Freeman wasn't the only JIC employee to experience race-based discrimination. Mayor Dan testified that Mayor Block "threaten[ed] on almost a daily basis to get rid of Kevin [Lucas]… because Kevin [Lucas] is black." [Comerford Depo. at 96:5–12]. Even one of Mayor Dan's "inner circle," Dan Tabor, "called Kevin a jigaboo" in front of the Mayor and the Town Clerk. [Lucas Depo. at 10:12; Comerford Depo. at 37:8–14, 38:3–4].[7] Finally, the record shows that on July 24, 2024, JIC's Deputy Town Clerk resigned her position, stating:

> Unfortunately, in the spring/summer of 2023 … a new culture arrived at the hands of … Block …. In my 40-year career, working both in government and the private sector, I can solidly say that I have never been a witness to the level of collusion, corruption, and ***blatant racism*** that has occurred in this Town over the last year with no end in sight.

[ECF No. 53-11 (emphasis added)].

Once again, at the end of the selection process, "the consultant recommended a single candidate, Dan Kerr." [Comerford Depo. at 79:23–25]. The Selection Committee brought Kerr "forward to the commission for acceptance and approval." [*Id.* at 79:24–80:1]. The Commission's "vote to approve Mr. Kerr was ... unanimous." [*Id.* at 80:5–7; ECF Nos. 43-3 ¶ 22; 43-8 ¶ 13; 43-9 ¶

---

[6] While many of the facts related to Schultz's treatment and references to Freeman in the summary judgment record are unequivocal, how they are to be construed *against JIC* is why we have jury trials. The credibility and weight to be given to evidence that a sitting Commissioner of JIC "directed" Schultz to engage in behavior to make Freeman's life "miserable," as well as the evidence that JIC investigated and terminated Schultz, are for a jury to determine when considering if JIC violated Freeman's rights or not.

[7] Mayor Dan also testified that: "Every single town manager and every single chief of police has a take-home vehicle…But the only two people who have ever been denied the use of [JIC-owned] vehicles both happen to be black guys, Mr. Freeman and Mr. Lucas." [Comerford Depo. at 46:5–8, 47:16–18; *see* Lucas Depo. at 38:17–25]. Freeman was the only police chief denied a Town car. Chief Pruitt and Chief Kerr (both white) each had use of one. [Comerford Depo. at 46:11; Lucas Depo. at 40:18–23]. The Commission complained to Mayor Dan about letting Freeman use the former Chief's car (after Mayor Dan had appointed Freeman to be the next chief and before the Commission voted not to).

8; 43-10 ¶ 8; 43-11 ¶ 12]. All five (5) Commissioners voted to hire Kerr as JIC's Police Chief, and each Commissioner submitted a sworn declaration that his or her vote for Kerr was not motivated by racial animus. *See* Declarations of Chip Block [ECF No. 43-3 ¶¶ 23–26, 29], Richard Busto [ECF No. 43-4 ¶¶ 24–26, 29], Gustavo Medina [ECF No. 43-8 14–17], Anthony Prosser [ECF No. 43-9 ¶¶ 8–9], and Pam Rauch [ECF No. 43-10 ¶¶ 9–12].

## II.    STANDARD OF REVIEW

To underscore the point: A motion for summary judgment should be granted only if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen*, 121 F.3d at 646.

If there are factual issues, summary judgment must be denied, and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Env'tl Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). Further, when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." *Id.* (alteration added and citation omitted).

## III.    DISCUSSION

### A.  Racial Discrimination

Race discrimination claims under the Equal Protection Clause and 42 U.S.C. § 1981, both brought through the procedural vehicle of 42 U.S.C. § 1983, are subject to the same framework as

race discrimination claims brought under Title VII. *See Cobb v. Floyd*, No. 21-10535, 2022 WL 856074, at *2 (11th Cir. Mar. 23, 2022) (citing *Lewis v. City of Union, Ga.*, 918 F.3d 2019, 1220 n.5 (11th Cir. 2019)). The Section 1981 and Equal Protection Clause claims "rise and fall" with the success or failure of the plaintiff's Title VII claim. *Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1335 n.7 (11th Cir. 2015).

To survive summary judgment, the plaintiff must present facts sufficient to permit a jury to find there was intentional discrimination. *See Lewis*, 918 F.3d at 1220 (en banc). A plaintiff can do this by (1) "present[ing] direct evidence of discriminatory intent," (2) "satisfying the burden-shifting framework set out in *McDonnell Douglas*," or (3) "demonstrat[ing] a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Reeves v. Columbus Consol. Gov't*, No. 23-11463, 2024 WL 33903, at *1–2 (11th Cir. Jan. 3, 2024) (quoting *Lewis*, 918 F.3d at 1220 & n.6) (internal quotation marks omitted)).

Direct evidence is that which shows an employer's discriminatory intent "without any inference or presumption." *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000); *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) (citations omitted). "Only the most blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Reeves*, 2024 WL 33903, at *1–2 (citing *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012) (quotation marks omitted); *see also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189–90 (11th Cir. 1997) (collecting cases where statements were sufficient to demonstrate direct evidence of discrimination under Title VII)).

When direct evidence of unlawful discrimination is lacking, Title VII plaintiffs may instead turn to the burden-shifting framework set out in *McDonnell Douglas Corporation v. Green* and *Texas Department Community Affairs v. Burdine,* 411 U.S. 792 (1973); 450 U.S. 248 (1981).[8]

---

[8]        Under the *McDonnell Douglas* burden-shifting framework,

Satisfying the *McDonnell Douglas* framework is not essential for a plaintiff to survive summary judgment. *Reeves,* 2024 WL 33903, at *1–2 (citing *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* at *1–2. In other words, a court must deny a defendant's motion for summary judgment if the plaintiff "presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (footnote and quotation marks omitted). A plaintiff may establish a "convincing mosaic" by pointing to evidence that shows, "among other things, (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023) (quotation marks omitted); *see also Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) (finding the plaintiff had established a "convincing mosaic" by showing, inter alia, that employees who committed similar misconduct remained employed, that a supervisor made racially biased comments, and that the supervisor gave "shifting reasons" for the plaintiff's termination).

While the "convincing mosaic" approach is more flexible than the *McDonnell Douglas* framework, it is not a separate legal test. *See Yelling*, 82 F.4th at 1342. The plaintiff's "'mosaic' of

---

[T]he plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably.

*Lewis*, 918 F.3d at 1220–21. In this circuit, "similarly situated" is defined as "similarly situated in all material respects." *Id.* at 1226. "If the plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221. If the defendant carries its burden, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Id.* (quotation marks omitted).

evidence must still be enough to allow a reasonable jury to infer but-for causation." *Id.* The "convincing mosaic" framework is rather a recognition "that courts must consider the totality of a plaintiff's circumstantial evidence" before granting summary judgment. *Id.* "When a plaintiff who alleges a racial discrimination claim under Section 1981 or Title VII presents factual and credibility disputes which require a jury to resolve and 'would allow a jury to infer intentional discrimination,' summary judgment is improper." *Jenkins*, 26 F.4th at 1251.

**B.  Summary Judgment and Plaintiff's Race Discrimination Claims**

Here, Defendant moves for summary judgment under the *McDonnell-Douglas* framework. [*See* ECF No. 45]. Freeman opposes summary judgment, applying the "convincing mosaic of circumstantial evidence" standard. [*See* ECF No. 55 at 12]. After reviewing the record evidence, the Court finds there exists direct and circumstantial evidence that would permit a reasonable jury to find that JIC intentionally discriminated against Freeman because of his race, as discussed below. However, that is not the end of the inquiry. Because Freeman has sued a municipality (JIC), each of his racial discrimination claims are analyzed differently, and the Court must parse each claim to determine whether each survives JIC's summary judgment motion. The Court begins its analysis with the more straightforward Title VII claim for racial discrimination.

1.  Title VII Race Discrimination Claim (Count III).

Title VII's discrimination provision makes it unlawful for covered employers to discriminate against an employee "with respect to his compensation, terms, conditions, or privileges of employment" due to the employee's membership in a protected class. 42 U.S.C. § 2000e-2(a)(1); *Davis v. Orange Cnty.*, No. 23-12759, 2024 WL 3507722, at *3 (11th Cir. July 23, 2024) (per curiam). Defendant does not dispute that it is a "covered employer" under Title VII. [*See* ECF No. 25 ¶ 2].

There are four elements of a Title VII discrimination claim: (1) the plaintiff must be a member of a protected class; (2) the plaintiff must have been qualified for the job he applied for; (3) the plaintiff

must show that the defendant rejected him for the position, despite his qualifications; and (4) the plaintiff must show that the position went to an equally or less qualified person who was not a member of the plaintiff's class. *See Anthony v. Sch. Bd. of Hillsborough Cnty.*, 92 F. Supp. 2d 1317, 1319 (M.D. Fla.), *aff'd sub nom.*, *Anthony v. Hillsborough Cnty. Sch.*, 237 F.3d 637 (11th Cir. 2000) (citing *Arrington v. Cobb County,* 139 F.3d 865, 873 (11th Cir. 1998)).

Record evidence exists that supports each element of this claim. Freeman is a member of a protected class because of his race. He was qualified for the position of Police Chief and was appointed to the position by Mayor Dan. JIC rejected Freeman for the position, and the position went to a white male with similar qualifications. [*See* Comerford Depo. at 43:5–14 (attesting the Kerr was his next choice after Freeman due to Kerr's qualifications)]. Moreover, the record reflects that Freeman suffered adverse employment action when JIC failed to promote him to Police Chief.

In *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), the Supreme Court clarified the showing required for adverse employment action under the anti-discrimination provision of Title VII. The plaintiff "need show only some injury respecting her employment terms or conditions," or, in other words, a "disadvantageous change in an employment term or condition." *Id.* at 974, 977 (internal quotation marks omitted). An injury need not constitute significant, serious, or substantial harm to suffice under the statute. *Id.* at 974. Given this standard, Freeman has clearly adduced sufficient evidence to show adverse employment action—both by being rejected as Police Chief and for being reduced to part-time work after he had been promoted to Deputy Chief—to survive JIC's motion for summary judgment.

The cumulative effect of the summary judgment evidence presents a mosaic of both circumstantial and direct evidence that would allow a jury to find JIC did not hire Freeman as Police Chief "because he is black." Mayor Dan, for example, testified to that unequivocally. [Comerford Depo. at 28:1-14, 31:1]. Furthermore, JIC's independent investigation into Freeman's complaints of

13

racial discrimination found he was discriminated against because of his race for a specific subset of time that is relevant to Freeman's claims. [Investigative Report, ECF No. 53-10 at 2–5].[9]

The words and statements that Freeman's supervisor (Schultz) used when referring to Freeman (in the hearing of others) are the kinds of "blatant remarks" that show direct (not circumstantial) evidence of discrimination. *See E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990) (holding that general manager's statement that "if it was his company, he wouldn't hire any black people" and production manager's statement that "you people can't do a – thing right" constitute direct evidence); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 n.3, 1072 (11th Cir. 1990) (holding that plant manager's constant barrage of racial slurs and statements such as "[t]hose niggers out there will not get anywhere in this company" constitute direct evidence); *Wilson v. City of Aliceville*, 779 F.2d 631, 633, 636 (11th Cir. 1986) (holding that mayor's statement that "he wasn't gonna let no Federal government make him hire no god-dam nigger" constitutes direct evidence); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 874–75 (11th Cir.1985) (holding that plant manager's statement that he wouldn't hire blacks because "[h]alf of them weren't worth a shit" constitutes direct evidence).

Schultz was, in fact, fired for discriminating against Freeman. [Freeman Depo. at 79:19-23; Lucas Depo. at 29:3–10]. The two Commissioners who blocked Freeman's appointment to serve as Police Chief co-chaired the selection committee, and the record reflects they were determined not to have Freeman serve as Police Chief *because* he is "black." [Comerford Depo. at 28:1-14, 31:1, 40:13–41:5]. The record also supports Freemen's contention that one of the Commissioners directed Shultz to make Freeman's life "miserable so Freeman would quit." [Investigative Report, ECF No. 53-10 at 2–5; *see* Comerford Depo. at 28:16–25].

---

[9] Of course, the fact an investigation was undertaken by JIC into specific aspects of this entire episode could be weighed by a jury as either mitigating or negating liability against the municipality. Again, that is for a jury at trial; at this stage, all factual inferences are drawn in Freeman's favor. *See Allen*, 121 F.3d at 646.

Moreover, the summary judgment record clearly shows that the third-party consultant hired by the Selection Committee included Freeman as a "strong candidate" after her initial screening and that a white male candidate, who was ultimately hired as Police Chief, was not deemed a "strong candidate" after the consultant's screening (even though he had applied for the position). [*See* ECF No. 53-9]. This evidence supports inferences that (1) the selection process was a sham, and (2) would also allow the factfinder to conclude with other evidence (a) that JIC allowed itself to be used as a tool by certain Commissioners and/or (b) that JIC allowed its imprimatur to be placed upon a façade erected by its Commissioners that covered over unlawful acts. (The inferences described above in 2(a) and 2(b) are also important for the discussion of the Section 1981 and 1983 claims below.)

Altogether, this mosaic of direct and circumstantial evidence could allow a reasonable juror to find that race was a "motivating factor" in JIC's decision not to hire Freeman to Police Chief. *See* Eleventh Circuit Pattern Jury Instructions, 4.5 Title VII (Apr. 15, 2024). Accordingly, Freeman's Title VII racial discrimination claim survives summary judgment.

2. <u>Section 1981 and 1983 Race Discrimination Claims and *Monell* (Counts I and II)</u>.

Freeman's Section 1981 and Section 1983 claims require a separate analysis because these claims are asserted against a municipality and are therefore subject to the requirements of *Monell v. Department of Social Services of City of New York,* 436 U.S. 658 (1978).

Title 42, United States Code, Section 1981, provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Section 1983 "constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981." *Bryant v. Jones*, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009) (citing *Butts v. County of Volusia*, 222 F.3d 891, 894–95 (11th Cir. 2000)); *see also Webster v. Fulton Cnty.,*

*Ga.*, 283 F.3d 1254, 1256 (11th Cir. 2002) ("Section 1981 is enforceable against a municipality through 42 U.S.C. § 1983.").

Therefore, Freeman's Section 1981/1983 claims against JIC are constrained such that "the discrimination must be a 'custom or policy' of that entity," or otherwise satisfy *Monell.  See Webster*, 283 F.3d at 1257 n. 8; *see also Butts*, 222 F.3d at 894 n. 4 (failing to allege "custom or practice" was a proper ground for granting summary judgment of Section 1983/1981 claim).  Because Freeman's Section 1981/1983 claims must satisfy *Monell*, the Court analyzes them together for purposes of summary judgment.

In its landmark *Monell* decision, the Supreme Court shifted course from its prior holding in *Monroe v. Pape*, 365 U.S. 167 (1961), and held that Congress intended to include local governments among the "persons" subject to liability under Section 1983—but only under limited factual circumstances.  *Monell*, 436 U.S. at 690.  To hold a municipality liable under Section 1983 after *Monell*,

> the constitutional deprivation must be undertaken pursuant to city "custom" or "policy," and not simply on the basis of *respondeat superior.  See St. Louis v. Praprotnik*, 485 U.S. 112, 125 n. 2 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 478–80 (1986); *Monell*, 436 U.S. at 694; *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir.1989).  Thus, "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 480; *see also Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990).
> A "municipal act" is not, however, limited to decisions made by the city's official legislative body or in written agreements.  City policy also may be implicated by the acts of individual policymaking officials or by pervasive city custom.  *See Mandel*, 888 F.2d at 791.

*Brown v. Fort Lauderdale*, 923 F.2d 1474, 1479-80 (11th Cir. 1991) (cleaned up).

Under *Monell* and its progeny, "the bar to establish municipal liability is very high." *Simmons v. Bradshaw*, 879 F.3d 1157, 1169 (11th Cir. 2018) (citation omitted).  Under *Monell*, a municipality may be held liable under Section 1983 only if *the governmental body itself* "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation; the doctrine of *respondeat superior* (holding a principal liable for the wrongful acts of a subordinate agent) is not enough to hold a

municipality liable under Section 1983.  *See Monell*, 436 U.S. at 692, 694; *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329.  "[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality,' *i.e,* acts which the municipality has *officially sanctioned* or ordered."  *Pembaur*, 475 U.S. at 480 (emphasis added).

Thus, a plaintiff must "identify a municipal policy or custom that caused [the] injury."  *Grech*, 335 F.3d at 1329 (cleaned up) (quoting *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998)); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 694).  "This threshold identification of a custom or policy 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.'"  *McDowell*, 392 F.3d at 1290 (quoting *Brown*, 520 U.S. at 403–04).  "This prevents the imposition of liability based upon an isolated incident."  *Id.* (citing *Depew v. St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986).  "Rather, the incident must result from a demonstrated practice."  *Id.* at 1290 (citing *Wayne v. Jarvis*, 197 F.3d 1098, 1106 (11th Cir. 1999)).

"A plaintiff can establish municipal liability under *Monell* in three ways: (1) identifying an official policy;[10] (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights."  *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 48 F.4th 1222, 1229 (11th Cir. 2022) (citation

---

[10]    An official municipal policy is a "statute, ordinance, regulation or decision officially adopted and promulgated by [a local governing] body's officers."  *Monell*, 436 U.S. at 690.  This case has adduced evidence showing that the formal decision by the Commission setting up the process to select the Police Chief—which was then manipulated and used a fig leaf that resulted in a final decision selecting the Police Chief—could be found to be official municipal policy that caused a deprivation of Freeman's rights.  JIC at this stage has not established that no genuine issue of material fact exists as to that point.

omitted).  Here, on this summary judgment record, Plaintiff has put all three ways in play.  Or more precisely, JIC has not shown on this record that there is no genuine issue of material fact such that *Monell* precludes liability for JIC at this stage.  The evidence in the record *could* allow a jury to conclude that:

> (1) the Commission put a *policy* into effect that caused the discrimination (setting up a process that allowed a subset of Commissioners to hide the municipality's unlawful acts behind a legalistic fig leaf, with the final Commission vote placing JIC's imprimatur upon it); or

> (2) JIC's *widespread practice* was so well-settled that it constituted a custom and usage with the force of law (racially discriminatory practices in the record were well-settled and persistent enough that they were the "acts which the municipality has *officially sanctioned* or ordered," *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, irrespective of the final formal Commission vote and the after-the-fact affidavits of the Commissioners); or

> (3) the Commission, which is the *final policymaker* over the governmental function at issue, caused the deprivation of Freeman's rights by sanctioning a process (authorizing the resolution and resulting sham process that allowed JIC to be used as a tool by a subset of the Commissioners to effectuate unlawful acts) causing the deprivation of Freeman's right to be free from racial discrimination.

It is not disputed by the parties that JIC is a Florida municipality established by Charter and governed by a five-member Commission.  [ECF No. 44 ¶ 4].  Therefore, the Commission serves as the final policymaking authority for JIC.  In its papers and at the hearing, JIC places great weight upon the final, formal act of the Commission:  all five Commissioners who voted to hire Kerr as JIC's Police Chief submitted sworn declarations (as part of this litigation) that his or her ultimate vote for Kerr was *not* motivated by racial animus.  [*See* Block Decl., ECF No. 43-3 ¶¶ 23–26, 29; Busto Decl., ECF No. 43-4 ¶¶ 24–26, 29; Medina Decl., ECF No. 43-8 14–17; Prosser Decl., ECF No. 43-9 ¶¶ 8–9; and Rauch Decl., ECF No. 43-10 ¶¶ 9–12].

While such formalities stand unrebutted in the record, they do not establish that there is no genuine issue of material fact such that JIC's liability is precluded under *Monell*.  To hold otherwise would go far beyond *Monell* and its development in subsequent cases and would render (practically)

any municipality immune from liability by the mere final recitation of a formal act divorced from all events that preceded it.  Freeman argues, and has evidence that permits the reasonable inference, that there was not a real "ultimate vote" at all; rather, the Commission was presented with only Kerr for a final vote, and they agreed to hire him without inquiring into how the Selection Committee arrived at its lone recommendation.[11]  [*Id.* at 71:10–11].

At the December 13, 2024 hearing on the Motion, the Court asked whether a full record of the selection process was presented to the Commission (to include the candidates considered, those eliminated, and how the Selection Committee arrived at its recommendation) before the Commission voted.  [Hearing Tr., ECF No. 71 at 9–10].  Freeman's counsel replied:  "It was not available to the Commission."  [*Id.*; *see also* Comerford Depo. at 79:19–80:18].  There are certainly facts in the summary judgment record that allow the inference that the Commission "rubberstamped" the recommendation of the Selection Committee, which Freeman says was hijacked by two Commissioners who did not want a black Police Chief.  In short, Freeman relies on an analogy to a "cat's paw" theory to hold JIC liable for discrimination:

> Here, the Selection Committee, which narrowed the field of eight viable candidates to just two operated as the fabled monkey, while the Commission or JIC suffered the consequences of the fabled burnt paw.  Put differently, the Commission took no action to independently investigate how the Selection Committee reached its results and merely rubber stamped the candidate presented eliminating any 'break [in] the causal chain" of the underlying bias of the Committee in eliminating FREEMAN.

[ECF No. 69 at 6].

---

[11]     It is also important to underscore that JIC has *not established* in the evidentiary record (1) the particulars of the process generated by the Commission vote to establish the Committee, (2) whether or not the Commission had discretion to disregard the process established by the initial resolution, or (3) what the Commissioners knew (or did not know) about the final presentation of Kerr at the final meeting.  Perhaps the trial record will clarify whether JIC could obtain a directed verdict because of *Monell*, or if one or more of the required methods under *Monell* fall by the wayside.  At this stage, however, JIC fails to meet its burden to establish no genuine issue of material fact regarding the process it now so heavily relies upon by pointing only to affidavits of Commissioners after-the-fact.

The "cat's paw theory" allows a Title VII plaintiff to show causation where the decisionmaker followed a biased recommendation without independent investigation. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). Thus, the person carrying out the adverse action (here, the Commission in its final vote) acts as the "cat's paw" for the person(s) with the discriminatory animus (a subset of the Commissioners). *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 521 n.5 (11th Cir. 2007).

The Eleventh Circuit has not conclusively held whether a "cat's paw theory" is unavailable in the *Monell* context. The Court has, however, discussed the theory in cases where no evidence supported it. *See Duncan v. Alabama*, 734 F. App'x 637 (11th Cir. 2018); *Martin v. Shelby Cnty. Bd. of Ed.*, 756 F. App'x 920 (11th Cir. 2018); *Stevens v. City of Forest Park*, 635 F. App'x 690 (11th Cir. 2015); *Griffin v. City of Jacksonville*, 762 F. App'x 965 (11th Cir. 2019); *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318 (11th Cir. 2020); *Gilroy v. Baldwin*, 843 F. App'x 194, 197 (11th Cir. 2021); *Robert v. City of Boca Raton, Fla.*, No. 21-13779, 2024 WL 3066604 (11th Cir. 2024). The Seventh Circuit has supported "imposing individual liability under § 1983 on subordinate government employees who act with unlawful motives to cause the actual decision-makers to take action against another employee." *Taylor v. Ways*, 999 F.3d 478, 487 (7th Cir. 2021) (citing *Smith v. Bray*, 681 F.3d 888, 898 (7th Cir. 2012), overruled on other grounds by *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016)); s*ee also Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009); *Simstad v. Scheub*, 816 F.3d 893, 902 (7th Cir. 2016).[12]

---

[12]    *See also Yerkes v. Ohio State Hwy. Patrol*, No. 22-3030, 2022 WL 17753528 (6th Cir. 2022) (allowing 1983 claim for individual liability to proceed under a "cat's paw theory"). Though lengthy, the *Yerkes* Court's specific discussion of "cat's paw theory" illustrates why a complete bar of a "cat's paw theory" under *Monell* is inappropriate, because invocation of a "cat's paw theory" often obscures the critical, causal facts that allow or defeat a claim under *Monell*:

> The district court referenced the "cat's paw" theory, R. 112 at PID 7258–59, which Defendants argue is inapplicable to this case. The theory states: "[I]f a supervisor performs an act motivated by ... animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate

The Tenth Circuit has questioned the cat's paw theory's applicability given *Monell*, but it failed to decide the question squarely. *See Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 794–95 (10th Cir. 2014). The Fifth Circuit also declined "to express an opinion" on the question. *See Okon v. Harris Cnty. Hops. Dist.,* 426 F. App'x 312, 318–19 (5th Cir. 2011); *Howell v. Town of Ball,* 827 F.3d 515, 526 (5th Cir. 2016). The Second Circuit, however, has stated that "Section 1983 claims for discrimination in public employment cannot be based on respondeat superior or 'cat's paw' theory to establish a defendant's liability." *Naumovski v. Norris,* 934 F.3d 200 (2d Cir. 2019) (Cabranes, J.).[13]

Five district courts in this Circuit have held that a "cat's paw theory" is not available in the *Monell* context. *See Polion v. City of Greensboro*, 26 F. Supp. 3d 1197, 1218 (S.D. Ala. 2014), *aff'd on other*

---

employment action, then the employer is liable...." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). This appeal would involve twisting the cat's paw theory around, as Yerkes is not attempting to hold the Patrol liable via the discriminatory intent of the Individual Defendants, but rather to hold the Individual Defendants liable via the adverse action of the Patrol. Some Sixth Circuit cases have applied the cat's paw theory in this non-traditional manner, including in § 1983 cases. *See DeNoma v. Hamilton Cnty. Ct. of Common Pleas*, 626 F. App'x 101 (6th Cir. 2015) (Title VII); *Paterek v. Vill. of Armada*, 801 F.3d 630 (6th Cir. 2015). But we have never explicitly adopted the reverse cat's paw theory, and the cat's paw theory—especially when used in reverse—is at its core just an application of the tort causation principles described above. Whether one terms it "reverse cat's paw" or simply "proximate causation," the results are the same, and the nomenclature is just semantics.
*Yerkes,* 2022 WL 17753528, at *6 n.6.

[13]    With great respect, *Naumovski* shows (as explained in *Yerkes*) how employing the label "cat's paw theory" leads to holdings that must be cabined by their facts, regardless of the broad pronouncements such cases may contain. The facts in *Naumovski* show that a "cat's paw theory" could not overcome *Monell* in that case—and rightly so. *See Naumovski*, 934 F.3d at 219–221. *Naumovski* involved the termination of an employee, allegedly in response to malicious rumors of sexual misconduct. *Id.* at 207–09. The supervisor that fired Naumovski, it was alleged, did so on the basis of unlawful sex discrimination under the Fourteenth Amendment and Section 1983. *Id.*   The crucial facts in *Naumovski* were that the Plaintiff could not show that the false rumors of sexual misconduct circulated by student-athletes at the school were a "but-for" cause of the Defendants' adverse employment action. *Id.* at 220–21. *Naumovski* therefore supports the proposition that Section 1983 claims require a showing of "but-for" causation (because of *Monell* and the background principles of tort law that animate Section 1983), and that the "cat's paw theory" put forward on those facts could not surmount the causation hurdle. Nothing in *Naumovski* supports a broad pronouncement of the total unavailability of a "cat's paw theory" of municipal liability because of *Monell*.

*grounds*, 614 F. App'x 396 (11th Cir. 2015) (per curiam); *Jackson v. City of Centreville*, 899 F. Supp. 2d 1209, 1222 (N.D. Ala. 2012); *Martin v. Dean*, No. 1:06-CV-0497-MHS, 2008 WL 11324082, at *7 (N.D. Ga. Oct. 21, 2008); *Norris v. City of Flovilla*, No. 5:14-CV-441, 2017 WL 902866, at *6 n.7 (M.D. Ga. Mar. 7, 2017); *Harper v. Houston Cnty. Bd. of Ed.*, No. 1:17-CV-721, 2019 WL 3072631, at *7 (M.D. Ala. July 12, 2019).   Four of these courts rejected the theory on grounds that a municipality cannot be held liable under a theory of respondeat superior (which, stated that way, is clearly correct, but a proven "cat's paw theory" does not suffer from that defect).  *See Martin*, 2008 WL 11324082, at *7; *Jackson*, 899 F. Supp. 2d at 1222; *Norris*, 2017 WL 902866, at *6 n.7; *Harper*, 2019 WL 3072631, at *7.  One district court recognized that the "cat's paw theory" is typically used to show causation; yet, it, too, ruled that "[w]hatever the applicability of cat's paw theory in determining causation… it has no place in determining the separate question of municipal liability."  *Polion*, 26 F. Supp. 3d at 1218.  Closely read, in fact, none of these district court cases support the global proposition that *Monell* creates an insurmountable barrier to any set of facts labeled "cat's paw theory."[14]  Indeed, the facts underlying cases that reject a "cat's paw theory" wholesale are so different from each other and this case that invocation of the label "cat's paw theory" often obscures more than it elucidates.

This Court concludes that there is nothing in *Monell* and its progeny, as stated in Supreme Court and Eleventh Circuit precedent, that precludes municipal liability here.  The summary judgment record here shows why.  A final decision maker enacting a policy or sanctioning a process that allows itself to be used as a tool or conduit for a person or persons with discriminatory animus *is not respondeat superior liability at all*.  *Monell* liability is entirely consistent with a "cat's paw theory," where the final

---

[14]    In our District, the Honorable Daniel T.K. Hurley once explained in *Sherrod v. School Bd. of Palm Beach Cnty.*, 703 F. Supp. 2d 1279 (S.D. Fla. 2010) *rev'd on other grounds sub nom.*, *Sherrod v. Johnson*, 667 F.3d 1359 (11th Cir. 2012) (per curiam), that if it could be shown that the School Board (in making its final decision to terminate) acted as a "mere conduit or 'cat's paw'" for a school superintendent or principal's allegedly biased recommendations, those facts "operate to join a fact issue" and did not preclude liability.  *Id.* at 1302–03.

decisionmaker—here, the Commission—abdicated its role, sanctioned an outcome, or knowingly affixed its imprimatur to a process so infected by racial discrimination that the municipality itself was a "but-for" cause of the unconstitutional deprivation.  That is not *respondeat superior* liability; rather, evidence that establishes a "cat's paw theory" can vindicate and overcome *Monell*.

JIC is not to face trial for the tortious actions of rogue subordinates acting within the scope of his or her duties when JIC's policy or practices forbade the conduct.  That is what *Monell* forbids.  Instead, JIC is to face trial to allow a jury to determine if *it sanctioned or acquiesced in a sham process* that put forward a racially discriminatory product with its purportedly race-neutral imprimatur to be affixed at the end—and thereby allowed itself to be used as a conduit to deprive Freeman of employment consideration without racial discrimination.

In cases where the plaintiff must prove that the discriminatory animus behind an adverse employment action was the actual cause of the decision, the Eleventh Circuit has recognized that one way of proving the discriminatory animus is the cat's paw theory.  *Stimpson*, 186 F.3d at 1331–32.  "This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee.  In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* (citation omitted).  However, where a subordinate involved in the decision-making process operates under an unlawful intent, this intent is not attributed to the final decisionmaker if the latter conducted his own independent evaluation and made a decision free of the subordinate's discriminatory animus.  *See, e.g., Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) (citing *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20 (11th Cir. 1999); *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998; *Willis v. Marion Cnty. Auditor's Off.*, 118 F.3d 542, 547 (7th Cir. 1997)).  Nothing in *Monell* requires a

23

different result; all *Monell* requires is proof that actions of a subordinate *that appear to be in opposition to or in derogation of municipal policy, custom, or practice* are, in fact, acts of the municipality itself.

Here, the summary judgment record is replete with evidence, direct and circumstantial, that allows the inference that the Selection Committee co-chairs did not act in opposition or derogation of the Commission but instead acted behind the scenes to effectuate an outcome of racial discrimination while the full Commission knowingly stuck its head in the sand and acted as a conduit of racial discrimination.  At least a subset of Commissioners did not want a black police chief; facts in this record allow for a reasonable inference that the Commission knew that shortly before and during the process enacted by the Commission itself.  First-hand witnesses provide explosive and contemporaneous evidence of patent racism by specific Commissioners and others who acted at their direction.  Further, the Commission did not have a full record of the selection process before it when it voted finally for Kerr—who was its only option and was selected even though the Selection Committee's hired consultant did not include Kerr as a finalist (but did select Freeman).  No minutes of the Selection Committee's meetings exist in the summary judgment record.  Moreover, there is no evidence put forward by JIC concerning the level of discretion or obligation the Committee was to afford the process created by the Commission's resolution.

If this is the mosaic of evidence at the close of trial, a reasonable juror could find on this record that the selection process was so infected by racism that the Commission's "clean-as-a-whistle" vote was a "cat's paw"—allowing itself to be used as a conduit by racist Commissioners who did the discriminatory deeds.  At this juncture, all that matters is that JIC did not establish that there is no genuine issue of the material facts required by *Monell* to obtain summary judgment in its favor.

This Court is aware of the Eleventh Circuit's holdings that there can be no section 1983 municipal liability unless a majority of the voting members of a municipality's governing body (here the Commission) "shared the illegal motive." *Mason v. Village of El Portal*, 240 F.3d 1337, 1340 (11th

Cir. 2001); *see also Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1298 (11th Cir. 2002). JIC's argument along these lines boils down to an attempt to allow after-the-fact affidavits by Commissioners (stating their final vote was not due to racial discrimination) as a "get-out-of-discrimination" card for the Commission. If the Court were to apply that rule to this set of facts, it would fly in the face of *Monell* and convert an important doctrine of limitation for municipalities (no *respondeat superior* liability) into a discriminatory taint eraser—no matter the record, as long as you hold a final vote and produce affidavits after-the-fact. Indeed, in other contexts the Eleventh Circuit "deviate[s]" from the general rule that "looks only to the conduct of the decisionmaker," precisely when the "decisionmaker followed the biased recommendation without independently investigating." *Lewis,* 934 F.3d at 1196 (applying "cat's paw theory" in Title VII case). "The cat's paw theory is not an exception to general principles of causation but a specific application of them in which the harasser *is the decisionmaker* regardless of which individual actually signs the employee's walking papers." *Id.* (cleaned up) (emphasis added).

JIC has not shown that a jury should be precluded from hearing evidence at trial that the Commission was used as "a mere conduit, or 'cat's paw,' to give effect to the [Busto and Block's] discriminatory animus." *Stimpson*, 186 F.3d at 1332. After the close of trial evidence, of course, the picture may look quite different than what has been presented to the Court on this motion. The trial evidence may preclude entirely any finding of municipal liability—and might even warrant a directed verdict in JIC's favor. All the Court decides today is that genuine issues of material fact exist as to whether the Commission knowingly allowed itself to be used as a conduit for the discriminatory animus of a subset of its officials. In our nation, a jury will decide the important factual issues that touch upon the very character of a community and the officials who govern in their name. Nothing in *Monell* or its progeny demands otherwise.

## IV.    CONCLUSION

It is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [**ECF No. 45**] is **DENIED**.   The parties shall file proposed dates for a jury trial as well as the number of days needed to try the case <u>by Monday, April 28, 2025</u>.

**DONE AND ORDERED** in the Southern District of Florida on April 7, 2025.



DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc: counsel of record